Thomas P. ATHRIDGE, et al., Plaintiffs,

v.

Jorge IGLESIAS, et al., Defendants.

Civil Action No. 89–1222 (HHG).

United States District Court,
District of Columbia.

Nov. 8, 1996.

Irving Starr, Richard Starr, Arlington, VA, Paul R. Pearson, Arthur, Pearson & Martin, Falls Church, VA, for Defendants.

## OPINION

HAROLD H. GREENE, District Judge.

### I. *Factual Background*

This case involves the tragic consequences of what apparently was a game of "chicken" engaged in by two teenagers. It arises out of an automobile accident that occurred on July 29, 1987 at approximately 1 p.m., in the 3100 block of Fessenden Street, N.W., Washington, D.C., when plaintiff Thomas P. Athridge ("Tommy") was struck by a vehicle

driven by defendant Jorge Iglesias ("Jorge").[1] At the time of the accident, Tommy was 15 years and 11 months old, and defendant Jorge was a little over 16 years.

Defendant Jorge had borrowed his cousin's manual transmission Volkswagen Jetta from the cousin's residence on 3739 Cumberland St., N.W., and drove the car to Mazza Gallerie in Friendship Heights. Jorge's best friend, James Ko, was also in the car. Not only did defendant take the car without the permission of the owner, but he did not have, and had never had, either a driver's license or learner's permit. At Mazza Gallerie, Jorge and Ko met plaintiff, one John Bruce Thornburg, and several other individuals, and some of these individuals, including plaintiff, were driven by defendant to a pool party at Erin Rupp's house at 3108 Fessenden St., N.W.

After staying at Rupp's house for approximately one-half hour, where some of the young people were drinking alcohol, defendant left in the Jetta, with Ko in the passenger seat and Thornburg in the rear seat, driving up Fessenden Street toward Connecticut Avenue. As they were driving away, Thornburg informed the defendant that Tommy's books were in the back seat. Defendant thereupon turned around and returned towards Rupp's house, heading east on Fessenden Street. He halted at a stop sign on Fessenden Street at the intersection with 32nd Street. Several of the individuals at Rupp's house were, at that time, standing outside of the house near Rupp's driveway. This group was plainly visible from the stop sign and the vehicle was likewise visible to the individuals standing next to Rupp's driveway.

The distance between the stop sign, where defendant stopped, and Rupp's driveway is 440 feet. The 3100 block of Fessenden Street, N.W. is a residential street. It does not have sidewalks, crosswalks or any traffic lights. The speed limit on Fessenden Street in this area is 25 mph. The weather on July 29, 1987 was sunny and clear.

As defendant's car approached the area where the individuals were standing, plaintiff moved into the middle of the road and began waving his arms. Thornburg, an eyewitness sitting in the back seat of the Jetta, testified that plaintiff was holding his hands out "motioning [defendant] to stop the car." Defendant himself has conceded that plaintiff was asking him to stop, but defendant continued driving toward plaintiff, accelerating to a speed of approximately 40 mph. Plaintiff could see the car as it approached, but he nevertheless remained in the middle of the road.

At the last moment, Tommy attempted to jump out of the way to avoid impact, but at that same moment Iglesias unfortunately swerved in the same direction. Iglesias never applied the brakes at any time. After defendant's vehicle struck plaintiff and threw him up on the windshield, the vehicle swerved to the north side of Fessenden Street, ran onto the lawn of a house located there, struck a large rock, became airborne, and eventually landed in a ravine where it skidded to a stop into two trees.

The physical evidence and the testimony of an accident reconstruction expert, Montgomery County Police Officer Charles Simpson, shows that defendant did not attempt until after impact a "critical swerve" or "yaw" in an effort to avoid plaintiff.[2] This expert testimony stands unrebutted by other expert testimony.

Plaintiff's body impacted on almost the dead center of the vehicle—both the center of the roof above the windshield and the center of the hood of the vehicle. Based on

---

1. Also a plaintiff in this case is Tommy's father, Thomas P. Athridge, Jr. ("Thomas"). Plaintiffs are residents of the state of Maryland. Defendant is a resident of the District of Columbia.

2. A critical swerve is the distance a driver needs to move a vehicle laterally in order to avoid a collision with an object in its path. At 40 mph the critical swerve is 159 feet, and at 30 mph the critical swerve is 119 feet. Thus, from the time

defendant reached the first house (172 feet from the end of the Rupp driveway), he would have had enough time to swerve out of the way and avoid a collision with Tommy Athridge had he been going 40 mph or slower. The Metropolitan Police estimated the point of impact of defendant's vehicle with plaintiff to be about 190 feet from the 32nd Street intersection with Fessenden.

the location of the head strike on the vehicle, an accident reconstruction expert was able to determine the speed at impact was 40–45 mph.

It is also significant that, according to the expert testimony of Officer Simpson, in the case of a "sudden stop," where an "unexpected event" materializes ahead of a driver, it takes 88 feet to halt a vehicle traveling 25 mph, allowing for 1.6 seconds reaction time; at 30 mph, it takes 113 feet to stop; at 35 mph, it takes 140.42 feet to stop; and at 40 mph, it takes 159 feet to stop. However, if the stop is not sudden, but the hazard is already visible in the road, the reaction time diminishes to half a second. The stopping distance then decreases to 48 feet at 25 mph and 64 feet for 30 mph. In the present case, the hazard was not completely unexpected. Tommy Athridge was plainly visible in the middle of the road. Accordingly, it is this Court's view that the defendant could have stopped in even shorter distances than those listed above.

Eyewitnesses John Bruce Thornburg and Manon Schmidtmam, both friends of the defendant, corroborated the testimony of plaintiff and the physical evidence that plaintiff was plainly visible in the middle of the street motioning defendant to stop. Schmidtmam testified that she saw the plaintiff in the middle of the street while defendant's car was still "[a]t the end of the block," near the intersection of a side street onto Fessenden, at least 200 feet away.

The testimony of James Ko, defendant's central witness, by contrast, was that defendant's vehicle was "two and a half to three car lengths" from plaintiff when plaintiff "stepped out" into the street. Ko also acknowledged, however, that he is not "very good with distances" in terms of feet, but that he is accurate at describing distances in terms of car lengths. However, Ko was quite inaccurate in describing various other distances in terms of car lengths. He estimated the distance from the stop sign at 32nd Street and Fessenden to the end of the

3100 block as "about twelve car lengths"—it is actually 677 feet—and estimated the distance from the stop sign to the point of impact as "about eight car lengths"—it is actually 417 feet. These distances would yield a "car length" of an enormous car: over 50 feet. The Court rejects the Ko testimony.[3]

Finally, defendant Jorge Iglesias testified that plaintiff was "somewhere around 30 feet, maybe" from the vehicle when defendant first saw him in the middle of the road. Even if the Court were to believe this statement, it would at best constitute an admission of negligent failure to keep a proper lookout. In any event, the Court finds credible the testimony of other witnesses that plaintiff was visible in the road at a much greater distance, and that defendant should have seen plaintiff at that distance.

## II. *Liability*

 Every person who drives on a public road in the District of Columbia is obliged to use ordinary care at all times to avoid striking other persons who may be using the roadway and to avoid placing himself or others in danger. *Lyons v. Barrazotto*, 667 A.2d 314, 321 (D.C.App.1995). This duty includes the duty to keep a proper lookout to observe traffic and other conditions which may confront the driver. *Id.* The Court concludes that defendant violated the duty of care to avoid colliding with plaintiff.

 Defendant was also negligent when he operated at an excessive speed, approximately 40 mph, on a street in a residential neighborhood. The evidence shows that this excessive speed was a proximate cause of the collision with plaintiff. *See WMATA v. Davis*, 443 A.2d 45, 51 (D.C.App.1982) (en banc).

 As noted, eyewitness testimony establishes that plaintiff was clearly visible to defendant at a much greater distance than the 30 feet at which defendant testified that

---

**3.** Ko in part corroborates the other witnesses when he testified that "we saw Tommy step out into the road when we were about halfway from the stop sign and Tom." Halfway between the stop sign and Rupp's driveway is 220 feet, which

is more than twice the distance required for stopping in reaction to an "unexpected event" from a speed of 30 mph and a significantly greater distance than the 159 feet required for stopping from a speed of 40 mph.

he first saw plaintiff in the road. A driver who fails to see a pedestrian who is plainly there to be seen violates the duty of ordinary care. *Lyons v. Barrazotto*, 667 A.2d at 321. Moreover, defendant never attempted to apply the brakes or sound his horn. Indeed, he made no effort to avoid the accident until "the very last second" according to eyewitness testimony.

On the basis of the entire record, including the testimony of witnesses and the fact that defendant was driving without a license, the Court finds that defendant was negligent in violating the duty of care owed toward the plaintiff.

### III. *Contributory Negligence*

Defendant asserts that plaintiff is barred from recovery because of his contributory negligence (which acts as an absolute bar to recovery in the District of Columbia). *Felton v. Wagner*, 512 A.2d 291, 296 (D.C.App.1986).

Although this is a close case, the Court concludes on the basis of the evidence that plaintiff was contributorily negligent. A reasonably prudent person would not stand in the middle of the road when an inexperienced driver is rapidly approaching in a vehicle. Rather, the prudent action would have been to wave the car down from the side of the road.

### IV. *Last Clear Chance*

Despite his contributory negligence, a plaintiff may be permitted to recover under the last clear chance doctrine. *Belton v. WMATA*, 20 F.3d 1197, 1199 (D.C.Cir.1994). In order to recover under this doctrine, a plaintiff must prove that:

(1) ... the plaintiff was in a position of danger caused by the negligence of both plaintiff and defendant; (2) ... the plaintiff was oblivious to the danger, or unable to extricate herself from the position of danger; (3) ... the defendant was aware, or by the exercise of reasonable care should have been aware, of the plaintiff's danger and of her oblivion to it or her inability to extricate herself from it; and (4) ... the defendant, with means available to him, could have avoided injuring the plaintiff after becoming aware of the danger and the plaintiff's inability to extricate herself from it, but failed to do so. *Robinson v. District of Columbia*, 580 A.2d 1255, 1258 (D.C.App.1990).

In this case, plaintiff was in a position of danger caused both by his own negligence and that of defendant, plaintiff was unable to extricate himself from the danger, and, by exercising reasonable care, defendant should have known of plaintiff's peril and could have avoided injuring him, but failed to do so.

The last clear chance doctrine is unavailable "if the emergency is so sudden that there is no time to avoid the collision." *Phillips v. D.C. Transit System, Inc.*, 198 A.2d 740, 742 (D.C.App.1964). However, in this case, on a clear day, where the group of teenagers, including plaintiff, outside Rupp's house, was clearly visible to defendant at the time his vehicle was 440 feet away at the stop sign, and where plaintiff walked into the road when defendant's car was about 200 feet away, the emergency was not "so sudden" that defendant did not have time to avoid the accident.

If, as defendant testified, he was only going about 30 mph, he could have swerved to miss plaintiff in less than 120 feet. He could have stopped in 88 to 113 feet. Defendant did neither. Instead he proceeded to accelerate from the stop sign, from where Tommy was plainly visible, and at no time took any evasive action. Furthermore, Tommy was standing in the middle of a 27 foot wide street—not in the middle of the eastbound travel lane in which defendant was driving. There was ample room for defendant to pass plaintiff on either side, but defendant continued directly towards him.

The Court concludes that under the last clear chance doctrine plaintiff is entitled to recover. *See Drapaniotis v. Franklin*, 504 F.2d 236, 237 (D.C.Cir.1974) (pedestrian recovered damages under last clear chance doctrine when hit "in the middle of the street near the white dividing line" on a clear evening when no cars parked on street

blocking vision).[4]

## V. *Damages*

Plaintiff suffered numerous physical injuries as a result of the accident: fractures of the left humerus, right tibia and fibula, impairment of the left upper extremity and the right lower extremity, soft tissue injuries to the cervical spine, permanent scars, and disfigurement. One of the scars is on the neck and related to a puncture wound from the hood ornament of defendant's car.

In addition, and most notably, plaintiff sustained brain damage from a massive skull fracture, with brain hemorrhage and prolonged coma, destruction of brain tissue by contusion, and resulting memory loss. Dr. William D. Singer, a neurologist on the faculty at the Harvard Medical School, testified as an expert in neurology and brain injury to the nature and permanency of plaintiff's brain injury. Dr. Singer testified that plaintiff suffered primary traumatic brain injury in the form of destruction of brain tissue by contusion and diffuse axonal injury. The most sensitive area for plaintiff was the frontal part of the brain, affecting the ability to socialize, concentrate and modify his behavior. In addition, the temporal lobes, thalamus, and parietal lobes were damaged, affecting plaintiff's ability to integrate information in order to execute plans. Dr. Singer further testified that plaintiff suffered secondary traumatic brain injury, such as epidural hematoma, bleeding on the right and left sides of the brain, and herniation. Plaintiff suffered severe, widespread and permanent brain damage, including a significant disturbance of intellectual function, poor short term memory, acquired attention deficit disorder, an inability to adapt to new situations, a tendency to become easily frustrated, and decreased socialization skills.

Plaintiff also suffered emotional injuries as a direct consequence of defendant's negligence: sleep disorder, depression, and an impairment in his enjoyment of life. Plaintiff's history since the accident is dismal: he was forced to withdraw from Gonzaga College High School; he then matriculated and withdrew from Mt. St. Mary's College and Montgomery College; and he finally enrolled in remedial classes at Curry College in its special program for learning disabled students. Plaintiff continues to require supportive counseling.

Because of the permanent brain damage, plaintiff will not be employable in "competitive employment." According to Dr. Singer, who has worked for 21 years with vocational counselors and employment organizations that provide employment for brain-injured individuals, plaintiff will only be employable in "an environment in which someone accepts his slowness, ... lack of productivity, ... and emotional inability." Plaintiff will be limited to relatively low-wage jobs and a high risk of unemployment because of his inability to learn new skills and quickly adapt to new environments. Plaintiff has held many jobs since the 1987 collision, but he has lost every single one.

On account of the amount paid for services provided to Tommy Athridge, a total of $110,010.78 is awarded to plaintiff Thomas P. Athridge, Jr.[5] For the permanent diminution in plaintiff's earning capacity, the Court enters a monetary award to plaintiff Tommy Athridge in the amount of $1,400,000. As explained below, this award represents the amount that plaintiff would have earned in his lifetime but for the injury.

Plaintiff presented evidence from an economics expert, Robert N. Fenili, Ph.D, as to the demonstrated earning capacity of someone of plaintiff's race, sex, age, and educational level. Then, this expert projected the figure for earning capacity over the working life of the plaintiff, on the assump-

---

4. The Court rejects defendant's argument that the doctrine of assumption of risk bars recovery for plaintiff. Assumption of risk is an affirmative defense focusing on the *actual* knowledge of an injured party. *Warner Fruehauf Trailer Co. Inc. v. Boston*, 654 A.2d 1272, 1274 (D.C.App.1995). There is no evidence that plaintiff actually knew the full magnitude of the danger and that he then voluntarily exposed himself to the danger. Immediately prior to the collision, defendant obeyed the stop sign at the corner of 32nd Street and Fessenden.

5. The parties have stipulated that this amount was reasonable and necessary.

tion that he would work until age 65, taking into account probable wage increases. The demonstrated earning capacity and actual future earning capacity were reduced by the expert witness to their present value using a valid discount rate. The loss of future earnings is the difference between the present value of the demonstrated earning capacity and the present value of the actual earning capacity. *District of Columbia v. Barriteau*, 399 A.2d 563, 567 n. 6 (D.C.App.1979).

In calculating plaintiff's actual future earnings, Dr. Fenili reviewed plaintiff's employment record and income tax returns from 1991 through 1995. Plaintiff's 1995 income of $4,388 corresponded to the expert testimony of neuropsychologist Dr. Linda Sapin, Ph.D., that plaintiff will likely only work half-time and at a minimum wage job, so Dr. Fenili calculated the present value of plaintiff's current income capability—$172,302—by projecting the 1995 income at an annual rate of 1.283, the rate by which real wages had increased from 1991 to 1995.

Dr. Fenili then subtracted plaintiff's current income capability of $172,302 from his projected income in each of three scenarios: (1) plaintiff receives only a high school degree; (2) plaintiff receives a college degree; and (3) plaintiff receives a professional degree. As indicated, prior to the accident, plaintiff was attending Gonzaga College High School, a college-prep high school. Based in part on information from Gonzaga, Dr. Fenili estimated the probability of each scenario as a 16% chance that plaintiff would obtain only a high school degree, a 60% chance that plaintiff would obtain no more than a college degree, and a 24% chance that plaintiff would obtain a professional degree.

 Plaintiff's siblings are each enrolled in professional degree programs (law and business) and the Court considers, as it may, the education of family in determining the probability that he would have reached a certain education level had the accident not

occurred. *WMATA v. Davis*, 606 A.2d 165, 177–78 (D.C.App.1992). In addition, prior to the accident, plaintiff had expressed an interest in becoming a lawyer. In light of all of the evidence, the Court finds that, but for the accident, plaintiff most likely would have obtained at least a college degree and there is a significant probability that he would have obtained a professional degree.

By using U.S. Department of Commerce, Bureau of Census statistics for the mean salary of white male college graduates aged 25 to 34 in 1991—$32,600—applying an appropriate increase to reflect 1996 dollars, Dr. Fenili projected this salary by 1.283 percent, the rate by which real wages had increased from 1991 to 1995. To this salary, Dr. Fenili added the value of fringe benefits as 30 percent of salary, based on a study by Mercer, a private consulting firm.

After calculating the base salary, the plaintiff's loss is further reduced by the cost that plaintiff would have incurred to attend college and/or professional school, based on the U.S. Department of Education's average of private and public school costs. Then, applying a discount rate of two percent to plaintiff's future expected earnings, Dr. Fenili calculated plaintiff's diminution in earning capacity based on the probability of the three scenarios (high school, college or professional degree) for a weighted average of $1,632,509.

On cross-examination, Dr. Fenili conceded that the thirty percent figure for fringe benefits as compared to salary "was probably over-estimated" because it included "[p]robably some estimate of vacation time." [6]

Without direct testimony by another expert, the Court cannot precisely determine the correct percentage of salary that fringe benefits constitute, but the Court nevertheless must reduce the inflated calculation of plaintiff's expert as to diminished earning capacity. Therefore, the Court awards the plaintiff $1,400,000 for the present value of

---

**6.** He later admitted that he did not know whether vacation was included and that in his view, fringe benefits consisted of "primarily insurance". Fringe benefits may indeed compose 30% of salary from the perspective of an employer. However, this does not necessarily reflect the fringe benefit to the employee because many

of the fringe benefits—such as vacation pay, holiday pay, and sick pay—are included in the compensation. *See* Wm. Gary Baker and Michael K. Seck, DETERMINING ECONOMIC LOSS IN INJURY AND DEATH CASES § 7.15 at 132–34 (1993).

his diminished earning capacity which is a direct result of the injuries caused by defendant Iglesias. The Court notes that this award may undercompensate plaintiff. But for the accident, plaintiff might have followed in the footsteps of his siblings, attending a prestigious professional school with the opportunity to earn a salary far in excess of the mean for white male college graduates. Of course, the Court is bound by the evidence presented in this case and the Court recognizes the speculative nature of predicting lost future earnings by means other than statistics of "the mean". Therefore, the Court orders defendant to compensate plaintiff for $1,400,000 in diminished earning capacity.

 In addition, plaintiff is awarded $4,000,000 in damages for the pain and suffering he has endured and will continue to endure for the rest of his life. This figure reflects the suffering resulting from plaintiff's traumatic brain injury, memory loss, cognitive impairment, his orthopedic and other physical injuries, and his depression and other emotional injuries. This is the case of a young man who has sustained severe mental and physical injuries as a direct result of defendant's negligence, and defendant must compensate plaintiff for these losses.

Finally, the Court enjoins defendant from conveying or transferring or from attempting to convey or to transfer the chose in action assets that are the subject of the Court's "freeze" orders of March 5 and March 14, 1996. The Court orders defendant to convey those assets to plaintiffs forthwith.

## VI. *Conclusion*

For the foregoing reasons, the Court will enter judgment in favor of plaintiffs. An Order will be issued contemporaneously herewith.

### ORDER

This matter was tried before the Court in March 1996. For the reasons stated in the opinion issued contemporaneously herewith, it is this 8th day of November, 1996,

ORDERED that judgment be and it is hereby entered for plaintiff; and it is further

ORDERED that plaintiff Thomas P. Athridge, Jr., is awarded $110,010.78 for the amount paid for medical services provided to plaintiff Tommy Athridge; and it is further

ORDERED that plaintiff Tommy Athridge is awarded $1,400,000 in damages for his diminished earning capacity that is a result of defendant's negligence; and it is further

ORDERED that plaintiff Tommy Athridge is awarded $4 million in damages for the pain and suffering that is a result of defendant's negligence; and it is further

ORDERED that defendant Iglesias convey to plaintiffs the chose in action assets that are the subject of the Court's "freeze" order of March 14, 1996.