**FIRST DIVISION**
**PHIPPS, C. J.,**
**ELLINGTON, P. J., and BRANCH, J.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules/

**November 21, 2013**

# In the Court of Appeals of Georgia

A13A1504. SMITH v. CSX TRANSPORTATION, INC.

BRANCH, Judge.

Larry G. Smith suffered a knee injury when he slipped and fell while ascending a set of stairs at a facility owned and operated by his then-employer, CSX Transportation, Inc. ("CSX"). Smith subsequently filed suit against the railroad seeking to recover for the injuries he sustained as a result of his accident. The case went to trial and the jury returned a verdict in favor of CSX. The trial court entered judgment on that verdict and Smith now appeals,[1] asserting that the trial court erred

---

[1] The current appeal represents the second appearance of this case before this Court. After a jury returned a verdict in favor of CSX in a prior trial, Smith appealed the judgment. We reversed, finding that a federal OSHA regulation requiring stair treads to be reasonably slip resistant and have nosings of a nonslip finish applied to the railroad building where Smith fell, and that therefore the trial court had erred in refusing to instruct the jury that CSX's alleged violation of that regulation was

in allowing CSX to introduce evidence of his employment disciplinary record. For reasons explained below, we find no error and affirm.

The record shows that on April 6, 2004, Smith was in the administrative building at the CSX facility in Walbridge, Ohio, to attend a meeting of the local safety committee. Smith was attending this meeting in his capacity as a local chairman of the United Transportation Union ("UTU").[2] After he entered the building, Smith went into the men's restroom on the first floor and then into the union office, which was also located on the first floor. When Smith left the union office, he began to proceed to the safety meeting, being held on the building's second floor. As he began to ascend the stairs, Smith placed his left foot on the second step and slipped and fell, injuring his left knee. An inspection conducted immediately after Smith's fall revealed that there was small circle of soap, approximately one inch in diameter, on the second step. Soap had also been "tracked" onto the third step, and there was soap on the bottom of

___

evidence of negligence. *Smith v. CSX Transp.*, 306 Ga. App. 897, 903 (2) (703 SE2d 671) (2010) ("*Smith I*"). The Georgia Supreme Court affirmed this decision and the case was remanded for a new trial. *CSX Transp. v. Smith*, 289 Ga. 903 (717 SE2d 209) (2011). It is the second trial that is at issue in this appeal.

[2] The "local chairman" title meant that Smith was the union representative for railroad conductors and brakemen working in five different railroad terminals in the northern part of the CSX system.

Smith's left work boot. This soap was the same kind that was used in the building's restrooms.

Smith filed suit against CSX under the Federal Employers Liability Act ("FELA"), 45 USC §51, et seq., which "provides a federal tort remedy for railroad employees injured on the job, [while] working within the scope of their employment." (Footnote omitted.) *Zeagler v. Norfolk Southern R. Co.*, 317 Ga. App. 302, 303 (730 SE2d 657) (2012). "Activities within the scope of employment include those that are necessarily incidental to the employment, even if the employee is off duty, but not those undertaken for a private purpose and having no causal relationship with the employment." (Footnote omitted.) *Smith I*, 306 Ga. App. at 898. See also *Fowler v. Seaboard Coastline R. Co.,* 638 F2d 17, 20 (5th Cir. 1981) ("the proper test for scope of employment in [a] FELA case [is] whether the act was one which the employer might reasonably have foreseen and which the employee might reasonably have thought necessary in the interest of or in the benefit of the employer"). To prevail on his FELA claim, Smith was required to prove "that he was protected by FELA at the time of injury; that CSX was negligent in that it breached its duty to exercise reasonable care under the circumstances to provide Smith a reasonably safe place in

3

which to work; and that CSX's negligence played some part in Smith's injury." (Footnote omitted.) *Smith I*, 306 Ga. App. at 898-899.

Smith's theory of liability was that a CSX employee had dripped or spilled soap on the stairs, most likely while transporting soap to the building's second floor restrooms. In support of this theory, Smith presented evidence showing that the building's janitorial closet was located on the first floor and that to get soap to the second floor restrooms the soap would have to be carried up the stairway on which he fell. CSX disputed this theory and introduced evidence showing that the staircase had been mopped the day before Smith's fall sometime between 4:00-5:00 p.m.; that CSX employees had ascended and descended the stairs beginning at approximately 6:30 a.m. on the morning Smith fell and that none of them had reported seeing any soap on the stairs; and that the step on which Smith slipped was the only step on which any alleged accumulation of soap appeared. The railroad also introduced testimony showing that open soap containers were never carried up and down the stairs. Rather, the soap came in bags encased in cardboard containers and these containers were placed into the soap dispensers. Thus, the soap dispensers were refilled by taking out the empty box and replacing it with a new box. CSX argued that these facts failed to show any negligence on its part.

CSX also disputed that Smith was acting within the scope of his employment at the time of his injury, because hours before Smith's fall he had been placed "out of service" for a safety violation. CSX introduced the testimony of Jim Horner and Justin Forro, two CSX supervisors who were conducting operational testing at several CSX facilities during the early morning hours of April 6, 2004 . These tests involved observing employees as they were working to ensure that they were complying with the railroad's safety rules. While at the rail yard in Wixom, Ohio, Forro and Horner observed Smith dismounting a moving locomotive, in violation of a safety rule. Horner immediately called Smith over for a conversation and informed him that he was "up for dismissal" and that he was being placed out of service. An out-of-service status means that an employee is relieved of his job duties until further notice and during the time an employee is out of service, he is not to be on CSX property for any reason without permission. After informing Smith he had been placed out of service, Horner and Forro escorted Smith to his car to ensure that he left the property. According to Forro, such an escort would be common under the circumstances to make sure than the employee in question did not "have a mishap. I mean . . . you know, if you're up for dismissal, you start grasping at straws sometimes."

At 4:56 a.m. on April 6, 2004, Forro sent an e-mail informing crew management that Smith was out of service and should not be called in to work. Additionally, the CSX computers were updated to reflect Smith's out-of-service status. When asked if Smith's out-of-service status was made clear to Smith before he left the rail yard, both Forro and Horner testified that it was, with Forro explaining that Smith "was very aware of [his out-of-service status]. I mean, you don't normally get escorted out of the building" by a supervisor.

Smith disputed the assertion that he had been placed out of service in the early morning hours of April 6 or that he had been informed of this alleged change in his employment status prior to the time he arrived at the Walbridge facility for the safety committee meeting. Although Smith acknowledged that Forro and Horner had spoken with him after observing his safety violation, Smith claimed the supervisors told him they would contact him the next day to discuss the matter.

Prior to trial, Smith filed a motion in limine seeking to exclude any evidence of his prior disciplinary record at the railroad. CSX opposed this motion, arguing that Smith's history of disciplinary problems and the fact that as a result of his prior disciplinary record he was "up for dismissal" following his latest safety violation was relevant to Smith's claim for lost future wages. CSX also claimed that this evidence

6

was relevant to the defense theory that, fearing he was about to be fired for his latest safety violation, Smith planted the soap on the steps and staged his accident. On the morning trial began, the court ruled that limited evidence of Smith's disciplinary record would be allowed. Specifically, the court allowed CSX to introduce the fact that Smith had been disciplined in the past, the dates the discipline was imposed, and the sanction imposed on him as a result of each disciplinary action; the court did not allow the railroad to introduce the reason underlying any prior disciplinary action taken against Smith. The trial court found that this evidence was relevant because it could "be used by the jury to evaluate what [Smith's] future earning capacity with [CSX] or any other railroad might have been."[3]

On cross-examination, CSX asked Smith if he recalled receiving eight different disciplinary sanctions between May 1994 and October 2003.[4] Smith denied any

---

[3] It is unclear whether the trial court found that this evidence was also relevant to the defense theory that Smith, fearing for his job, had staged the accident. Just as the trial court began to rule on Smith's motion in limine, the following appears in the transcript: "[Whereupon a technical error occurred for approximately five minutes in the taking down of the proceedings and is not contained herein.]" We have discerned the trial court's finding regarding the evidence's relevance to Smith's claim for lost future wages from comments made by the trial court during a discussion with Smith's attorney, which occurred after the trial court found the evidence admissible.

[4] The dates of the disciplinary sanctions were May 1994, April 1997, February 1998, June 1998, February 2002, March 2002, April 2003, May 2003, and October 2003.

recollection of four of the first five incidents, testifying that he remembered only that he "was suspended a couple of times, went through the appeals process and got the [suspension] time erased and everything." With respect to the disciplinary action that resulted in Smith being suspended for thirty days in June 1998, Smith testified that he remembered being suspended that year, but that the suspension was overturned through the appeals process. Smith also acknowledged that he could recall receiving disciplinary suspensions in April, May, and October of 2003.

On appeal, Smith contends that the trial court erred in allowing this evidence concerning his disciplinary record because it was irrelevant to the issue of liability or damages and that it was highly prejudicial. We disagree.

A trial court's ruling that evidence is relevant "will not be reversed absent abuse of discretion." *Ga. Dept. of Corrections v. Couch*, 312 Ga. App. 544, 549 (3) (718 SE2d 875) (2011). "This is so because trial courts, unlike appellate courts, are familiar with a piece of litigation from its inception, hear first-hand the arguments of counsel, and consider disputed evidence within the context of an entire proceeding." (Citation omitted.) *A. A. L., Inc. v. Colonial Pipeline Co.*, 280 Ga. App. 237, 238 (1) (633 SE2d 560) (2006). Thus, as an appellate court we "defer to the trial court with regard to the admission of evidence, unless the lower court's decision is so flawed as to constitute

an abuse of discretion." Id. (citation and punctuation omitted). Moreover, "unless the potential for prejudice in the admission of evidence substantially outweighs its probative value, the Georgia rule favors the admission of any relevant evidence, no matter how slight its probative value." (Punctuation omitted.) *Ahmed v. Clark*, 301 Ga. App. 426, 429 (688 SE2d 361) (2009). Even "[e]vidence of doubtful relevancy . . . should be admitted and its weight left to the jurors." Id. And if evidence "is competent for any purpose," its admission does not constitute error. (Citation and footnote omitted.) Id.

Smith asserted that the knee injury he sustained in his fall left him permanently disabled, and sought to recover his lost future wages. The evidence supporting the amount of lost future wages Smith was claiming consisted solely of Smith's testimony regarding the salary and benefits he would have received under his union contract from the time of the accident through June 30, 2012, the date he had planned to retire. Given that Smith was seeking to recover a definite amount of salary and benefits that he contended he would have received but for his injury, we find that CSX was entitled to introduce evidence showing that, because his job was in jeopardy, Smith might not have received that amount. Accordingly, the trial court did not err in finding that

9

Smith's disciplinary record, and the fact that he was "up for dismissal" as a result of that record, was relevant to Smith's claim for lost future wages.

Although there is little case law on this issue, one court addressing this precise question found that evidence of a railroad employee's disciplinary record was relevant to his damages claim under FELA. *National R. Passenger Corp. v. McDavitt*, 804 A2d 275 (D. C. App., 2002). In that case, McDavitt, a railroad engineer, sued his employer under FELA for injuries he suffered in a train derailment, alleging that the accident had left him totally and permanently disabled. To support his claim for lost wages and lost earning capacity, McDavitt presented the testimony of an economic expert who opined as to McDavitt's net wage loss from the date of the accident to the date of trial and as to the present value of his lost future earning capacity. Id. at 289 (III) (A). The expert based his opinion on the assumption that but for his injuries McDavitt would have worked as a railroad engineer until the age of 65. Id. At trial, McDavitt's employer sought to introduce McDavitt's disciplinary record, arguing that it was relevant to show that the assumptions of McDavitt's economic expert were incorrect. Id. Specifically, the employer argued that McDavitt's disciplinary record, together with his conduct related to the accident resulting in his injury, would have "render[ed] him unemployable as a locomotive engineer in the future." Id. The trial court refused

to allow the introduction of McDavitt's disciplinary record, however, on the grounds that it would unduly prejudice McDavitt as to the issue of liability. Id. at 290-291 (III) (B). The appellate court reversed, reasoning:

> In evaluating lost earning capacity, the plaintiff's occupational abilities, industriousness, work habits and experience are relevant. *See, e.g., Bower v. O'Hara,* 759 F2d 1117, 1123 (3d Cir. 1985) (holding that proffered testimony of former employer that plaintiff was an unreliable worker "was plainly relevant to the issue of damages, as it bore on his claim for loss of earning capacity") . . . The plaintiff's work history, good or bad, bears on whether, how, and how long the plaintiff probably would have been employed had he not been injured. . . . Thus, McDavitt's railroad disciplinary record was relevant to his claim for lost earnings. His history of rule infractions and resulting interruptions of employment indicated, at least arguably, that his future as a locomotive engineer was clouded and uncertain even before he became disabled. That history therefore undercut the optimistic assumptions of McDavitt's economist and could have been used by Amtrak's expert to support a lower lost earnings projection.

(Citations omitted.) Id.

11

This reasoning is in harmony with Georgia law, which provides that evidence relevant to lost earning capacity[5] includes the plaintiff's "earnings before the injury, earnings after the injury, probability of increased or decreased earnings in the future, considering the capacity of the injured party, effects of sickness and old age, etc." (Citation and punctuation omitted.) *Myrick v. Stephanos*, 220 Ga. App. 520, 521 (2) (472 SE2d 431) (1996). Accordingly, we find the rationale of *McDavitt* persuasive and applicable to the current case. We therefore conclude that the trial court did not abuse its discretion in ruling that limited evidence of Smith's disciplinary record was relevant and admissible. The jury could consider that evidence, together with the evidence showing that as a result of his safety violation on the early morning hours of April 6 Smith was in danger of losing his job, in determining whether Smith had

---

[5] Under Georgia law, a plaintiff asserts a claim for lost earning capacity where he seeks to recover earnings lost as a result of a physical injury that he contends left him permanently or totally disabled. *Myrick v. Stephanos*, 220 Ga. App. 520, 521 (2) (472 SE2d 431) (1996). "[A] claim for 'lost earning capacity' embraces a recovery for lost future earnings." (Citations omitted.) Id.

12

proven his claim for lost future wages.[6] Id.; *McDavitt*, at 290 (III) (B). Cf. *Martinez v. Union Pacific R. Co.*, 82 F3d 223, 227-228 (IV) (8th Cir. 1996) (trial court did not err in excluding evidence of plaintiff's termination from railroad as a result of the accident in which he was injured where his economic expert testified that prior to his injury, the plaintiff could have worked for an automotive body repair business, a job which he had done in the past and was qualified for, at the same wage he had earned at the railroad).

Additionally, we find that the evidence of Smith's disciplinary record was relevant to CSX's theory that, fearing he was about to lose his job, Smith staged his accident. In reaching this conclusion, we emphasize that Smith's disciplinary record was by no means the only evidence supporting this theory of defense. Other evidence included the fact that hours before the accident Smith had been placed out of service and informed that he was up for dismissal; that he understood that being out of service

---

[6] Despite Smith's assertion to the contrary, our holding in *Norfolk Southern R. Co. v. Schumpert*, 270 Ga. App. 782 (608 SE2d 236) (2004), does not require a different result. *Schumpert* simply held that a railroad employee's post-accident termination could not bar his FELA claim for damages resulting from injuries sustained in that accident. Id. at 786-787 (2). See also *Pothul v. Consolidated Rail Corp.*, 94 FSupp2d 269, 271-272 (II) (N. D. N. Y., 2000). Here, although the record reflects that Smith was terminated for cause approximately one year following his fall, the trial court did not permit CSX to introduce that fact into evidence.

13

meant that he was not to go on CSX property without permission; that he nonetheless went to the Walbridge facility for a safety committee meeting; that while serving on the safety committee was one of his duties as a union representative, Smith's attendance at the meeting in question was not mandatory; that accumulated soap was present only on the step where Smith slipped and fell; that employees who had traveled the stairs earlier that morning had not reported seeing any soap on the steps; and that shortly before his fall Smith, by his own admission, had been in a restroom where soap was available. Given these circumstances, the trial court did not err in admitting the limited evidence of Smith's disciplinary record. See *Tucker Nursing Center v. Mosby*, 303 Ga. App. 80, 84 (2) (692 SE2d 727) (2010) ("[r]elevant evidence includes acts or circumstances which serve to elucidate or throw light upon a material issue") (citations and punctuation omitted).

Finally, we do not find that any potential prejudice to Smith resulting from the admission of disciplinary sanctions previously imposed against him substantially outweighed the probative value of this evidence. As noted above, the evidence of Smith's disciplinary record was limited, in that CSX could not introduce the nature of Smith's conduct that resulted in disciplinary action against him. And Smith offered rebuttal evidence with respect to his disciplinary record, testifying that one or more

14

of the suspensions had been overturned on appeal. Smith also asserted that others of the disciplinary citations were false, explaining that he was cited for infractions on at least two occasions when he was not even at work. According to Smith, these baseless citations resulted from the fact that because of his union activities, railroad management did not like him and had placed "a target on his back." One of Smith's colleagues corroborated Smith's testimony in this regard, explaining that Smith was an "aggressive" union representative who "irritated" railroad management. Given these circumstances, and considering all of the other evidence introduced at trial, we cannot say the trial court abused its discretion in finding that the probative value of the evidence concerning Smith's disciplinary record outweighed any potential prejudice to Smith.

Because the evidence at issue was relevant to the issues of both liability and damages, and because its probative value was not substantially outweighed by any potential prejudice to Smith, we find no abuse of discretion by the trial court in admitting this evidence. We therefore affirm the order of judgment entered by the trial court.

*Judgment affirmed. Phipps, C. J., and Ellington, P. J., concur in judgment only.*