**Enrique CALVA–CERQUEIRA,**
**Plaintiff,**

v.

**UNITED STATES of America,**
**Defendant.**

**Civil Action No. 99–1198 (RMU).**
**Document Nos. 125, 126, 134.**

United States District Court,
District of Columbia.

Sept. 10, 2003.

Gerard E. Mitchell, Laurie A. Amell, Stein, Mitchell & Mezines, Washington, DC, for the Plaintiff.

Edith M. Shine, Robert E. Leidenheimer, Jr., Assistant United States Attorney, Washington, DC, for the Defendant.

Danny C. Onorato, Barry Coburn, Coburn & Schertler, Washington, DC, Guardian ad litem.

### *FINDINGS OF FACT AND CONCLUSIONS OF LAW*

URBINA, District Judge.

## I. INTRODUCTION

This case involves a 1998 collision ("the accident") between a bus owned and operated by defendant United States and an automobile operated by plaintiff Enrique Calva–Cerqueira. As a result of the accident, the plaintiff suffers from paralysis, decreased sensation in the left side of his body and is wheelchair bound. The plaintiff, who was 18–years–old at the time of the accident, brings this case pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671 *et seq.* On May 3, 2001, the court determined that the defendant was liable for the accident. Having presided over an eight-day trial on the plaintiff's actual damages and likely future damages, the court now determines that substantial evidence supports an award of the following compensatory damages: $5,000,000 for pain and suffering, $899,325 for past medical expenses, $2,562,906 for future lost wages, and $15,435,836 for future medical and related expenses. The court reduces the award to a total of $20,000,000 because the plaintiff's original claim for damages requests that amount. Finally, resolving two miscellaneous issues, the court declines to adopt the defendant's request for a reversionary medical trust and determines that the defendant shall pay the fees of the guardian *ad litem.*

## II. FINDINGS OF FACT

### A. Procedural History

1. On August 3, 2000 the court granted the defendant's motion to bifurcate the liability and damages portions of this action. On May 3, 2001, after a three-day bench trial on the issue of liability, the court determined that the defendant was liable for the accident and resultant injuries to the plaintiff. Findings of Fact and Conclusions of Law dated May 3, 2001 ("FFCL") at 16. Beginning on December 9, 2002, the court presided over an eight-day bench trial on the issue of the plaintiff's damages. On February 25, 2003, the parties filed proposed findings of fact and conclusions of law.

### B. Summary of the Plaintiff's Life Before the Accident

2. The plaintiff was born on November 16, 1979, the second son of Maria Teresa Cerqueira and Ro-

berto Calva. Pl.'s Ex. 146. His older brother Daniel was born in 1977. *Id.*

3. The plaintiff spent his early years in Mexico City. *Id.;* Pl.'s Ex. 121. His parents separated in 1984 and divorced two years later. Pl.'s Ex. 146. After completing first and second grade in Mexico City, the plaintiff moved with his mother and brother to Ithaca, New York. Pl.'s Exs. 121, 146. The plaintiff's elementary school grades ranged from average to above average. Pl.'s Ex. 121. The plaintiff and his brother spent the summer of 1991 with their father in Mexico, and then elected to remain in Mexico with their father. Pl.'s Ex. 146. The plaintiff's school grades from 1991 through 1994 ranged from average to good. Pl.'s Ex. 121.

4. On December 25, 1994, the Calva–Cerqueira family was on a vacation in Italy when they were involved in a motor vehicle accident ("1994 accident"). Tr. 2/81–83, 2/104.[1] Roberto Calva, the plaintiff's father and a pediatrician, testified that he attended immediately to his son and observed no loss of consciousness. *Id.* Although the other occupants of the vehicle were not injured, the plaintiff suffered a fracture of the maxillary sinus, the thin bone which serves as the orbital floor and the upper boundary of the maxillary sinus. Tr. 2/36, 2/82–83.

5. The defendant presented evidence attempting to prove that this 1994 accident caused the plaintiff a mild brain injury, and the plaintiff presented evidence to the contrary.

*E.g.,* Tr. at 1/38, 2/36, 3/46–48, 3/75, 5/62–64, 6/127–28, 8/106–07, 8/127–28; Def.'s Exs. 21A, 23A, 53; Pl.'s Exs. 23, 111A–B. No such brain injury is documented in the plaintiff's medical records. *Id.* In addition, the defendant's evidence of the plaintiff's alleged mild brain injury is not compelling and would require this court to speculate. *Id.*

6. While living with his father in Mexico, the plaintiff suffered an emotional breakdown and was hospitalized for six weeks for detoxification from cocaine, inhalants, alcohol and other illegal drugs. Tr. 3/112–13, 3/117, 3/122–23; Pl.'s Ex. 35. Upon discharge from the detoxification program, the plaintiff was diagnosed as having a depressive disorder. Pl.'s Ex. 32.

7. In January 1997, the plaintiff moved to the United States to live with his mother in Fairfax, Virginia. Pl.'s Ex. 146. He participated in a second substance abuse treatment program and saw a psychiatrist, Dr. Eliot Sorel, from January through November 1997, but continued to abuse drugs during that period. Tr. 1/90–91, 5/64–65, 5/109–11, 7/5–22; Pl.'s Exs. 6, 27, 49.

8. In November of 1997, Dr. Sorel recommended that the plaintiff consent to urine screening. Pl.'s Ex. 49. Despite his family's encouragement, plaintiff chose to discontinue seeing his psychiatrist and continued to abuse illegal drugs and alcohol. *Id.;* Tr. 5/114–15, 7/49. Dr. Sorel's records indicate that the plaintiff was using marijuana three

---

**1.** References to the official trial transcript are to the day and page. In other words, "Tr. 1/6–7" denotes the trial transcript for day 1 of the trial at pages 6–7.

times a week in late 1997. FFCL at 7. The plaintiff continued this frequency of usage up to the time of the accident. *Id.*

9. At the plaintiff's post-accident urine drug screening, which was administered at 11:15 on the morning of the accident at George Washington University Hospital, he tested positive for cannabis. *Id.* The laboratory report indicated that the test was a "presumptive screen only," and could be positive up to two weeks after marijuana use. *Id.*

10. Due to academic difficulties at W.T. Woodson High School caused by his mid-semester enrollment, the plaintiff failed three classes, received a "B" in a math class, and then withdrew from the school. Tr. 4/82–83, 5/66; Pl.'s Ex. 121. He subsequently enrolled at the Fairfax County Adult Education program, which afforded him an opportunity to earn the equivalent of a high school diploma. *Id.* His English teacher stated that he loved learning, was very bright and motivated, and had clear goals. Tr. 4/74–75. She added that he had an excellent attendance record and "was definitely college material." Tr. 4/82.

11. The plaintiff held several part-time jobs during the 1997–98 school year. Pl.'s Ex. 146. He worked at Kentucky Fried Chicken ("KFC") from April 29, 1998 until the date of his injury, June 14, 1998. *Id.* The plaintiff's supervisor at KFC at the time of the accident, Maria Rivera, testified that he was enthusiastic, smart, intelligent, very motivated, and had perfect attendance. She said that she promoted him twice and that she would hire him back. Tr. 4/6–9. The plaintiff also played soccer with the Fairfax Police Youth Club League during the 1997–98 school year. Tr. 5/67. Jason Velasco, the plaintiff's soccer coach, testified to the plaintiff's perfect attendance over three seasons, interest in college, excellent physical condition, aptitude, and the absence of any hint of neurological problems. Tr. 3/130–33.

12. The plaintiff's rehabilitation psychiatrist, Dr. Sorel, testified that the plaintiff had demonstrated improvement. Tr. 7/55. Although the plaintiff did not enroll in urinalysis drug testing as Dr. Sorel had hoped, ambivalence is usual and customary for late adolescent patients. Tr. 7/61–62. Thus, the plaintiff was, more likely than not, on the road to full recovery immediately prior to the fateful accident.

13. Considering the plaintiff's pre-accident circumstances, the court finds that the plaintiff's prospects improved when he returned to the United States to live with his mother, largely due to her close supervision of him. Tr. 5/70–75, 5/105–20. The plaintiff's academic and social performance showed improvement: by spring 1998 the plaintiff was better adapted socially, holding down a job, and looking forward to college following graduation from high school. Tr. 5/118–20. He had exhibited interest in taking the SAT, secured checking and savings accounts in his own name, and paid many of his own expenses. Tr. 1/67–70, 2/85–100, 5/105–18. The plaintiff's mother testified that he had taken steps toward college and, like her other son Daniel, he would

attend the northern Virginia community college ("NOVA") and then continue on to a four-year college. Tr. 5/118–20. Similar to the plaintiff's work at a fast food restaurant while attending school, Daniel worked at a bagel store while he attended NOVA. Tr. 5/120. The plaintiff had discussed attending NOVA with his brother, psychiatrist, soccer coach, and a family friend. Tr. 1/70, 1/75, 3/132, 4/96; Pl.'s Ex. 23A. The plaintiff's brother's path—working at a restaurant during school, attending NOVA while living at home, then enrolling at Georgetown and medical school—served as a road map for the plaintiff. Tr. 1/62–63, 5/120.

14. The plaintiff was a bright young man with good cognitive functions. His standardized testing scores showed above average intelligence, and he frequently scored his best grades in subjects such as mathematics, science, and English that indicate his potential for higher cognitive functioning. Tr. 4/75, 4/96. Further, the plaintiff has a highly educated family: his mother has a doctorate degree in nutrition, his father is a medical doctor and practicing pediatrician and gastroenterologist, his brother is attending medical school, and an uncle and a cousin are practicing veterinarians. Tr. 2/81–85, 5/61–62.

15. The plaintiff's vocational rehabilitation expert, Dr. Estelle Davis, testified that the plaintiff would likely have finished college and at least two years in a graduate program. Tr. 4/34–37. She based her opinion on her interviews of the plaintiff's mother, teacher and tutor; her review of the plaintiff's academic, intelligence testing, medical and drug treatment records; and the educational level of the plaintiff's family. *Id.*

16. The defendant's vocational rehabilitation expert, Mr. Steven Shedlin, considered similar information, but while he did not focus on the educational achievements of the plaintiff's family, he did focus on the plaintiff's alleged pre-accident brain injury. Tr. 7/197–98. Mr. Shedlin stated that the plaintiff's drug abuse was a serious concern, because drug abusers generally cannot maintain employment. Tr. 7/197. Ultimately, Mr. Shedlin opined that the plaintiff would not complete college. Tr. 7/197–98.

17. The testimony of the plaintiff's expert, Dr. Davis, is more credible than that of Mr. Shedlin because it addressed the facts of this case more thoroughly and more realistically. For example, the plaintiff's two promotions at Kentucky Fried Chicken belie Mr. Shedlin's suggestion that the plaintiff could not work because he was abusing drugs—demonstrating that his drug problem was not as severe as Mr. Shedlin believed. Tr. 4/6–9, 7/197.

18. Based on the plaintiff's family history and substantial progress toward full recovery by early June 1998, the court finds, by a reasonable certainty, that the plaintiff likely would have finished college and two years in a graduate program. Tr. 2/154–55, 3/94, 4/46–47; 7/62–63.

## C. The Accident

19. On Sunday, June 14, 1998, the plaintiff was involved in a tragic

motor vehicle accident. FFCL at 2. On that morning, the plaintiff, then 18 years old, was driving his car eastbound on Eye Street, S.W. at its intersection with South Capitol Street in Washington, D.C. *Id.* The other vehicle involved in the accident was a Smithsonian Institution bus, which was proceeding southbound on South Capitol Street when it collided with the plaintiff's car. *Id.* The plaintiff's car weighed an estimated 3,380 pounds (including occupants), while the Smithsonian bus weighed an estimated 25,950 pounds (including occupants). *Id.* The bus driver was driving in excess of the applicable 25 mph speed limit when she drove through a red light and into the intersection where she hit the plaintiff's car. *Id.* at 13–14.

### D. The Plaintiff's Post–Accident Medical Treatment

20. The plaintiff arrived by ambulance at the George Washington University Hospital Emergency Department at 9:25 a.m. on June 14, 1998. Pl.'s Ex. 1 at 5, 9–10; Tr. 1/6–7. He had sustained multiple traumas including injuries to the brain, skull and chest and was in a deep coma. *Id.*

21. After three weeks of treatment at George Washington University Hospital, the plaintiff was transferred in a comatose state to the National Rehabilitation Hospital ("NRH"). Pl.'s Exs. 2, 4; Tr. 4/110–18. He remained at NRH until December 24, 1998, and began to communicate verbally in August 1998. *Id.* His mother sat with him everyday. Tr. 5/68.

22. On January 4, 1998, the plaintiff moved to the Learning Services Corporation where he received 24–hour supervision from skilled trainers specializing in the care of brain-injured adults. Pl.'s Ex. 5 at 16–19. Following the plaintiff's departure in March 1999 from the Learning Services Corporation, he began outpatient rehabilitation training in an adult day program at NRH. Pl.'s Ex. 7; Tr. 1/79–80. He is currently receiving physical therapy three times per week at Fairfax Rehabilitation, Incorporated. *Id.*

23. The plaintiff continues to reside with his mother in Fairfax, Virginia. He has someone with him at all times. Tr. 5/77–82.

24. The plaintiff has incurred medical bills totaling $899,325.46 as a result of the accident. Pl.'s Ex. 158. According to his mother, her insurance company has a medical lien in the amount of $400,000–$500,000. Tr. 5/92–93. The court finds that the record includes no proof that the plaintiff's health care providers did not require full payment from the plaintiff and no proof of the exact amount of the insurance company's lien.

### E. The Plaintiff's Injuries Caused By the Accident

25. The plaintiff suffered severe and permanent injuries, physical and mental disabilities, pain, emotional distress, disfigurement, deformity, and inconvenience as a result of the defendant's negligence. Tr. 1/34–40, 2/47–50, 2/53–54.

26. Dr. Thomas P. Naidich, a professor of neuroradiology at Mt. Sinai Medical Center and the author of

innumerable articles and books on brain imaging, summarized the plaintiff's brain imaging studies. Tr. 2/46. Dr. Naidich explained that the plaintiff's imaging studies unequivocally demonstrate that the accident caused by the defendant inflicted extensive brain tissue damage that permanently altered the configuration of the plaintiff's brain, including the cortex, brain stem, and cerebellum. Tr. 2/47–50, 2/53–54. Specifically, the MRI and CT films show skull base fractures on the right and left sides, the absence of the right frontal lobe, and hemorrhagic damage and scarring in the basal ganglia affecting the putamen, globus pallidus, caudate and the internal and external capsules. Tr. 2/46–48. In addition, there has been partial loss and damage to the crossing fibers of the commissure or corpus collosum, the lenticular nucleus, the midbrain, the fibers connecting the brain and spinal cord, the cerebral peduncles, and the thalamus, as well as fractures of the bones in the left ear. Tr. 2/48–58. A comparison of the MRI films of February 28, 1997 with the MRI films of December 16, 1999 shows that the accident caused substantial scarring and atrophic volume loss of the right superior frontal gyrus, middle frontal gyrus, precentral gyrus and to some extent the right postcentral gyrus. Tr. 2/56. In the wake of the trauma to the brain, multiple hemorrhages resulted in diffuse bleeding in various areas of the brain and when those areas liquified as part of the necrotic process they left behind multiple cavities. Tr. 2/53–54. P.E.T. scanning performed on February 16, 2000 confirmed the absence of functional brain activity in many of these areas. Pl.'s Ex. 10.

27. Dr. Anthony, J. Caputy, a neurosurgeon, Dr. Naidich, Dr. Richard N. Edelson, a neurologist, and Dr. Paul Fedio, a neuropsychologist, explained the functional significance of the loss of these neuroanatomical regions of the plaintiff's brain. Tr. 1/34–36, 1/46, 1/51–52, 2/16, 2/21–23, 2/27–32, 2/53, 2/145, 3/45. The extensive damage to the plaintiff's brain has resulted in serious impairment of higher cortical functions, neurocognitive deficits, and multiple neuromuscular disabilities with paralysis, paresis, and contractures of the musculoskeletal system in the torso, head, and four extremities. *Id.* The brain injury has rendered the plaintiff quadriparetic and resulted in a complete loss of mobility such that he now requires wheel-chair transportation plus assistance in making all transfers between wheelchair, bed, and bathing facilities. Tr. 2/23–29, 2/45, 3/45–46. The damage also has resulted in the inability of the plaintiff's brain to process and retain information, as well as a loss of ability to integrate information received from sensory and motor experience. *Id.* The absence of the plaintiff's right frontal cerebral area has caused him to encounter great difficulty in cognition, thinking and control of impulses. *Id.*; Tr. 2/147–49. According to Dr. Naidich, the body has much less ability to compensate when a person has suffered bilateral or multifocal injuries, making it more likely to have permanent, irreparable

damage as the plaintiff exhibits. Tr. 2/76.

28. The damage to the plaintiff's cerebellum has hindered the plaintiff's spatial orientation and equilibrium. Tr. 1/24, 1/35, 5/74–75. Damage to the plaintiff's thalamus and hypothalamus has resulted in the loss or impairment of body sensation, long and short term memory function, learning, information retrieval and use, visual spatial orientation, and appetite. Pl.'s Ex. 156; Tr. 1/133, 2/45, 4/113.

29. Dr. Fedio evaluated the cognitive and personality functions of the plaintiff over five formal sessions and a home visit in May 2002 to assess the plaintiff's home environment. Pl.'s Exs. 202B, 202C; Tr. 1/142–44. Based on his own extensive testing and review of the plaintiff's school and medical records, Dr. Fedio concluded that the 1998 accident caused a tremendous amount of brain injury that has left the plaintiff severely impaired. Tr. 1/145. He noted that the primary loss is the massive hole in the plaintiff's right frontal lobe but that there is extensive injury all over the plaintiff's brain. *Id.*

30. Wechsler Adult Intelligence Scale testing showed that the plaintiff's language skills (left brain) are still relatively good, but that his visuospatial skills (right brain) are severely impaired. Pl.'s Exs. 161A–B, 202B at 6–7, 202C at 4–5. The accident also impaired the plaintiff's memory, perceptual organization, processing speed, and ability to understand information quickly. Tr. 2/163–65; Pl.'s Exs. 202B at 8–9, 202C at 5–6. Since the accident, the plaintiff has exhibited a very limited capacity for learning. Tr. 2/148. The plaintiff also has exhibited severe attention and concentration deficits since the accident, and has a severe memory and learning disability. Pl.'s Exs. 202B at 8, 202C at 5–6.

31. Dr. Edelson explained that there are "islands" of preserved function, such as verbal skills, but the plaintiff has lost other cognitive processes that are essential to overall cognitive performance. Tr. 3/52.

32. The plaintiff also has an executive function disorder which manifests itself in a severe disability in practical reasoning and problem solving. He lacks the ability to plan and to foresee the consequences of his behavior. Tr. 2/146. The plaintiff has lost the area of the frontal lobe that controls judgment, decision-making and social decorum. Tr. 1/115, 4/43.

33. The evidence demonstrates that the plaintiff is permanently disabled from gainful employment, even in a protected environment, and most likely will not finish college. Pl.'s Ex. 202C at 8; Tr. 4/44.

34. Dr. Ross Silverstein, a board-certified psychiatrist and clinical professor at Georgetown University, has been treating the plaintiff since October 2000 and has been seeing the plaintiff about once a month since March 2001. Tr. 3/82. Dr. Silverstein testified to his psychiatric diagnosis of dementia secondary to head trauma, and explained that the plaintiff's emotional, mental, and cognitive functioning is principally determined by the massive brain injury suffered as a result of the 1998 accident. Tr. 3/82–83. Dr. Silverstein described the plain-

tiff as a vulnerable individual with multiple emotional, cognitive, and behavioral problems who requires ongoing psychiatric treatment. *Id.* The plaintiff is completely out of touch with the reality of his life and has an unrealistic sense of his abilities and goals. *Id.* at 83. Dr. Silverstein testified that the plaintiff could become depressed as the reality of his deficits becomes more apparent to him. Tr. 3/86–87. Dr. Silverstein explained that the plaintiff will require psychiatric assistance for the remainder of his life, on an average of one session per month. Tr. 3/92. Dr. Silverstein was particularly concerned that the plaintiff would suffer acute deterioration if he were taken away from his family and put back into a group home or institutional setting. Tr. 3/93. He was specifically concerned that the plaintiff would "see the world as having given up on him" and "might experience that as punishment." *Id.*

35. Experts for the plaintiff and the defendant agreed that the plaintiff is dependent upon some level of assistance 24 hours a day, seven days a week. Tr. 1/148, 3/49–50, 4/141–42, 4/149, 5/175, 6/91, 6/99, 6/147–48. Even at night the plaintiff frequently requires assistance. His mother testified that he wakes up at night to go to the bathroom or to seek comfort. Tr. 5/99. He has fallen out of bed at least six times within the last year. Tr. 5/100. Leaving the plaintiff alone would not be safe because he could fall, have a seizure, leave the stove on, or attempt a dangerous maneuver in his wheelchair. Tr. 3/50, 4/14–15, 4/178, 5/79–80, 6/91.

36. The court observed the plaintiff and watched a short videotape of his home functioning. Through these observations, the court finds that the plaintiff is a severely impaired individual who is wheel-chair bound, unable to ambulate, unable to transfer or move unassisted from chair to bed, and dependent on the assistance of others. Tr. 3/160, 5/64–75. In contrast, prior to June 14, 1998, the plaintiff had excellent motor functions and was able to walk, hike, jog, run, swim, play soccer, lift heavy objects, and otherwise function as a fully normal 18–year–old male. Tr. 3/130–33, 4/70–71. He was a gifted soccer player, described by his former coach as having "an incredible left foot" and by his mother as "dynamite on the soccer field." Tr. 3/131, 5/67.

37. The plaintiff appreciates many of his deficits. Tr. 6/31. He suffers mental anguish when he hears that he will never walk again and is self conscious about his surgical scars. Tr. 1/83, 4/17, 5/72. He is frustrated and anxious over questions of sexuality. Tr. 1/84. He feels hurt and frustrated when he upsets others by his inability to learn and understand. Tr. 3/140. He feels disheartened when reminded of the long list of courses he must complete to graduate from NOVA. Tr. 5/76.

38. In summary, as a result of the plaintiff's severe head and brain injuries, he suffers the loss of many bodily and mental functions and a great deal of pain, suffering, and mental anguish. The plaintiff has paralysis and decreased sensation in the left side of his body. Tr. 4/182. He has lost physical

strength, is wheelchair bound, and has to wear braces. Tr. 3/165; 2/23–29, 2/45; 3/45, 5/80. His braces pinch and cause pain. Tr. 3/165, 5/84–85. His exercises also cause pain. Tr. 4/170, 5/78–79. He suffers incontinence. Tr. 5/126. Aging will afflict him more severely, so that at age 40 he will more closely resemble a 60 or 70 year-old person. Tr. 3/54. He gets depressed at times and will likely develop depression in the future. Tr. 3/89, 3/99.

### F. Future Medical Care and Related Needs

39. The parties each presented life care plans demonstrating that the plaintiff requires chronic care for the remainder of his life expectancy including full-time attendant care either at home or in a group residential setting. Pl.'s Ex. 151; Def.'s Ex. 19. The plaintiff's expert, Ellen Barker, R.N., and the defendant's expert, Linda Kopishke, R.N., both prepared life care plans for the plaintiff. *Id.* Both life care plans account for the fact that the plaintiff is wheelchair bound and contemplate extensive services based on a life expectancy of 70 years. *Id.* The first major difference between the plans is whether this care should be provided in the plaintiff's family setting or in a group setting. *Id.* The second is the hourly wage of attendants. *Id.* The third major area of dispute concerns the frequency of medical and related services. Tr. 1/125–34, 4/130–31, 5/176–77; Pl.'s Ex. 151.

40. Addressing the first factual issue, the court considers that the plaintiff's mother, father and brother are committed to keeping the plaintiff in his home environment and outside the confines of a group home or institutional setting. Tr. 1/78, 5/86, 5/123, 8/24. The plaintiff's physiatrist, Dr. Stephen Wills, testified that the plaintiff is not suited for an adult daycare program or group home due to the extent of his injuries. Tr. 4/130. For these reasons, the plaintiff's well-being would be better served by living with or close to his family and not receiving care at a group home.

41. Considering the second factual issue, the provisions for attendant care, the court recognizes that the Barker life care plan provides for a day-time skilled-care attendant charging $50 per hour and a different evening and night-time attendant charging $8–10 per hour. Pl.'s Ex. 151 at 18. The defendant's experts, Ms. Kopishke and Dr. Alan Frankel (the defendant's economist), testified that no skilled-care attendants charging $50 per hour exist—rather, the hourly rate is lower. Tr. at 6/96, 8/82–83. In contrast, Ms. Barker testified that this is a reasonable fee for a nurse or medical student working through an employment agency, and she had confirmed this belief several years ago when she spoke to an employment agency in the Fairfax area. Tr. at 1/171–72. Judging the testimony and relevant facts, the court finds Ms. Barker's testimony more credible than that of Ms. Kopishke or Dr. Frankel on this wage issue.

42. Turning to the third major factual issue regarding the life care plans, the court finds that Dr. Richard

Zorowitz, a professor of rehabilitation medicine who testified for the defendant, agreed with the plaintiff's experts that the Kopishke plan was deficient in not providing for care by specialists in neurology, orthopedics, urology, pulmonology, ear-nose-and-throat, plastic surgery, and nutrition. Tr. 5/176–77; Pl.'s Ex. 153. The Barker plan expressly covers these services, and Dr. Wills testified that these services are necessary for the plaintiff's care. Tr. 4/130–35; Pl.'s Ex. 151.

43. After listening to the extensive testimony regarding the two life care plans, and reviewing the testimony and the plans themselves, the court finds that the plaintiff's life care plan addresses the plaintiff's future medical care and related needs far better than the defendant's plan. Pl.'s Ex. 151; Def.'s Ex. 19. The court also finds that the plaintiff's experts—Nurse Barker, who created the plan, Dr. Wills, the plaintiff's physiatrist, and Dr. Edelson, the plaintiff's neurologist—have reasonably recommended the items in the plan as necessary for the plaintiff's future care. *E.g.*, Pl.'s Ex. 151; Tr. 1/120, 4/130–35.

## G. Present Value Calculations

44. The plaintiff's expert economist, Dr. Richard Lurito, utilized a methodology which calculates the likely escalation of the plaintiff's future medical and related expenses and future lost wages, and then discounts those future damages figures to their present value using an after-tax discount rate. Tr. 4/203–06; *see also* Pl.'s Exs. 203F, 203G (Dr. Lurito's reports). This approach recognizes that some categories of costs and wages generally increase faster than inflation. Pl.'s Ex. 153.

45. On the other hand, the defendant presented two experts each with different approaches to estimating the current value of future economic costs. Tr. 8/30–131. First, Dr. Alan Frankel utilized a "real" or net interest rate approach. Tr. 8/35–36; *see also* Def.'s Exs. 27A–D (Dr. Frankel's reports). The "real" interest rate represents the difference between the overall rate of return on investments and the overall rate of inflation. *Id.* This method, which uses this "real" interest rate as the net discount rate, assumes that the growth in medical and related care costs and in the wages of college graduates will be same as the growth in the consumer price index generally. Tr. 8/63–64, 8/138–40. Second, Mr. Thomas Walsh proposed a "market present value" approach, which uses the cost of an annuity to determine the cost of a future stream of payments. Tr. 8/112; *see also* Def.'s Exs. 20A–E (Mr. Walsh's reports).

46. The field of economics is not an exact science and provides multiple methods for reaching the same goal: the estimate of future losses. One significant difference between Dr. Lurito's calculations and Dr. Frankel's calculations is that Dr. Frankel did not use an after-tax discount rate for most of his calculations, while Dr. Lurito did. *Compare* Tr. 8/49–50, 8/86 *with* Tr. 4/207–08 *and* Pl.'s Ex. 163; Pl.'s Ex. 203G at 10. The choice of an after-tax versus before-tax discount rate significantly affects the calculation of the net discount rate by

which future sums are being reduced to present value. *See* Pl.'s Ex. 163. Overall, of the three experts, the court finds the plaintiff's expert, Dr. Lurito, most clear and compelling.

47. The court also finds that the bulk of the plaintiff's future economic damages consists of health care and attendant care costs. Pl.'s Ex. 153. If the rate of growth in these items is understated, or if future costs are discounted at an excessive rate, the consequences to the plaintiff could be devastating—he might not be able to pay for medical care needed because of the defendant's negligence. *Compare* Def.'s Ex. 27D at Ex. 20 (Dr. Frankel's chart, showing that the present value of the plaintiff's life care plan when calculated with a 3.0 percent discount rate is $7,001,712) *with* Tr. 4/213 *and* Pl.'s Ex. 153 (Dr. Lurito's chart, showing that the present value of the plaintiff's life care plan when calculated with a –0.5 percent discount rate is $14,237,416 to $15,534,956).

48. Dr. Lurito projected that the cost of the items in Ms. Barker's life care plan will rise at a rate faster than the overall rate of inflation. Tr. 4/209–11, 5/17. He assumed that the overall rate of inflation will be 3.0 percent per year and that the cost of items in Ms. Barker's life care plan will rise at an average rate of 5.0 percent per year. Tr. 4/205–06, 4/209–12; Pl.'s Ex. 153. He based this assumption on (a) a current annual growth rate in medical care services costs of 5.35 percent; (b) a likely future growth as described in the 2002 Economic Report of the President;[2] and (c) a growth in the costs of medical care services over the 1986–2001 period of 5.67 percent per year. Tr. 4/210–12; Pl.'s Exs. 164 at 149, 203G.

49. In an economy where the overall demand for personal and home care aides is projected to increase by 67 percent by the year 2010, it is likely that the prices charged by home care agencies will generally grow faster than consumer prices. Tr. 5/52–53; Pl.'s Ex. 172 at 188. Thus, it is more probable than not that, as in the past 20 years, average earnings for health care providers and average prices for medical-related goods and services will continue to rise at approximately 1.5 times the overall inflation rate. Pl.'s Exs. 152A–B, 203G; Tr. 5/52–54, 8/139–40. Accordingly, Dr. Lurito's calculation of the likely fu-

---

**2.** The 2002 Economic Report of the President states:

Health care spending grew rapidly during the past decade, from $916.5 billion in 1990 to $1,311.1 billion in 2000, or more than 3.6 percent a year on average (2.6 percent a year in per capita terms; Chart 4–1). *Home health care expenses and drugs were the fastest growing categories of this expenditure* (Chart 4–2). The real, constant-dollar cost of private health insurance increased by 4.9 percent a year between 1984 and 1999. . . . Growth in health care costs is projected to accelerate, with total expenditure predicted to account for 16 percent of GDP by 2010. Over the longer term, forecasts predict that health care spending will become even more predominant in the economy, continuing a 60–year economic trend and reaching as much as 38 percent of GDP under conservative assumptions.

2002 Econ. Report of the Pres. at 149 <http://w3.access.gpo.gov/usbudget/fy2003/pdf/2002_erp.pdf> (emphasis added).

ture growth in medical and related expenses is reasonably certain.

50. Turning to the future lost wages estimate, Dr. Lurito calculated the likely escalation in the wages that the plaintiff would have enjoyed absent his injuries caused by the accident. Tr. 5/16–24. Dr. Lurito supports his use of a 4.5 percent escalation rate for the plaintiff's future earnings absent injury with the 2002 Economic Report of the President, which shows that the earnings of college and post-college educated males in the United States have historically increased by a yearly amount well in excess of the inflation rate. Tr. 5/23–24; Pl.'s Ex. 171.

51. As with future medical and related expenses, the failure to take long-standing economic reality into account—that is, making the assumption that the earnings of college graduates will increase at the rate of overall inflation—would result in a significant understatement of the plaintiff's probable future earnings loss. Tr. 5/17–24. Thus, the court is persuaded that the plaintiff's future earnings, absent injury, would have been at the level of a person with two years of graduate study, and that such earnings would likely have grown at an average of 4.5 percent per year as calculated by Dr. Lurito. Tr. 5/23–24; Pl.'s Exs. 171, 203G.

52. Reducing the plaintiff's future lost earnings and medical and related expenses to present value, Dr. Lurito applied a 4.5 percent after-tax discount rate. Tr. 4/205–08, 5/46; Pl.'s Ex. 163. Dr. Lurito based his choice of discount rate on the rate of return on conservative bond and money market investments. Pl.'s Ex. 152E. The actual before-tax yield on this portfolio is 5.2 percent and the after-tax yield is 3.9 percent. Pl.'s Ex. 152E.

53. Dr. Lurito calculated the present value of plaintiff's future medical and related expenses based on an after-tax discount rate of 4.5 percent and an overall growth rate of 5.0 percent, producing a net discount rate of negative 0.5 percent. Tr. 4/213. Dr. Lurito calculated the present value of the plaintiff's future lost earnings based on an after-tax discount rate of 4.5 percent and growth rate of 4.5 percent, producing a net discount rate of zero percent. Tr. 5/21.

54. Having observed and reviewed the testimony of the expert economists, the court is satisfied that Dr. Lurito's methods and calculations are based on substantial evidence and provide a reasonably certain estimate of the plaintiff's future lost wages and medical and related expenses.

## III. CONCLUSIONS OF LAW

### A. Legal Standard for Compensatory Damages

■ In cases arising under the FTCA, the law of the state where the misconduct occurred governs substantive tort liability, including the nature and measure of damages to be awarded. *Richards v. United States*, 369 U.S. 1, 11, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962). "In the District of Columbia, the primary purpose of compensatory damages in personal injury cases 'is to make the plaintiff whole.'" *District of Columbia v. Barriteau*, 399 A.2d 563, 566 (D.C.1979) (quoting *Kassman v. Am. Univ.*, 546 F.2d 1029, 1033 (D.C.Cir.1976)).

■ Courts must base compensatory damages awards on substantial evidence and not on mere speculation. *Wood v. Day,* 859 F.2d 1490, 1493 (D.C.Cir.1988); *Romer v. District of Columbia,* 449 A.2d 1097, 1100 (D.C.1982). Substantial evidence is more than a scintilla, but the evidence "need not point entirely in one direction." *Doe v. Binker,* 492 A.2d 857, 860 (D.C.1985). Described differently, substantial evidence is that which forms "an adequate basis for a reasoned judgment." *Romer,* 449 A.2d at 1100. While the plaintiff need not prove damages to a mathematical certainty, the court must have a reasonable basis upon which to estimate the damages. *Wood,* 859 F.2d at 1493; *Spar v. Obwoya,* 369 A.2d 173, 180 (D.C.1977).

■ Regarding damages for the future consequences of a tort, an item is recoverable if the plaintiff proves by a reasonable certainty that the future consequence would have occurred or will occur. *Wood,* 859 F.2d at 1492–93; *Sheehan v. United States,* 822 F.Supp. 13, 17 (D.D.C. 1993); *Curry v. Giant Food Co. of the Dist. of Columbia,* 522 A.2d 1283, 1291 (D.C.1987). Courts have defined the "reasonable certainty" standard as identical to the preponderance of the evidence standard. *Moattar v. Foxhall Surgical Assocs.,* 694 A.2d 435, 439 (D.C.1997) (citing *Wilson v. Johns–Manville Sales Corp.,* 684 F.2d 111, 119 (D.C.Cir.1982)). In addition, courts should only award damages for future medical expenses when the expenses are reasonable and necessary. *Muenstermann v. United States,* 787 F.Supp. 499, 522 (D.Md.1992).

Using this framework, the court considers the individual types of compensatory damages that the plaintiff requests: pain and suffering, past medical expenses, future lost wages, and future medical and related expenses.

## B. Pain and Suffering

The plaintiff requests an award of $8,000,000 for his past and future pain and suffering as caused by the accident. Pl.'s 2d Am. Prop. FFCL at 93. The defendant argues that an award of $750,000 would be reasonable. Def.'s Prop. FFCL at 31.

■ The plaintiff in the instant action has presented substantial evidence to prove that he suffers from severe and permanent injuries, physical and mental disabilities, pain, emotional distress, disfigurement, deformity and inconvenience as a result of the defendant's negligence. *Wood,* 859 F.2d at 1492; *see also Doe,* 492 A.2d at 861 (explaining that pain and suffering damages are appropriate for "conscious" pain and suffering). The plaintiff has proven that he appreciates many of his deficits. *Jones v. Miller,* 290 A.2d 587, 590 n. 5 (D.C.1972) (stating that in determining pain and suffering damages, the court may consider the nature and extent of the injured party's suffering and his "internal condition perceptible to his senses"). For example, he suffers mental anguish when he hears that he will never walk again, he is self conscious about his surgical scars, he is frustrated and anxious over questions of sexuality, and he feels hurt and frustrated when he upsets others by his inability to learn and understand. Beyond these items, the record also attests to many other losses and a great deal of pain, suffering, and mental anguish. For example, the plaintiff has paralysis and decreased sensation in the left side of his body. He is wheelchair bound and has to wear painful braces at all times. His stretching and other exercises are very painful. Prior to the accident, the plaintiff was healthy, intelligent, looking forward to attending college and a skilled soccer player.

In *Athridge v. Iglesias,* the court considered brain injuries similar to those of the

instant plaintiff. *Athridge v. Iglesias,* 950 F.Supp. 1187, 1192 (D.D.C.1996). Like the plaintiff in this case, the plaintiff in *Athridge* suffered brain damage resulting in loss of memory; damage to the frontal lobe resulting in lost ability to socialize, concentrate and modify behavior; physical impairment; loss of ability to integrate information and execute plans; and emotional trauma. *Id.* While the plaintiff in *Athridge* functioned well enough to hold part-time minimum wage employment, the plaintiff in this case will most likely not be able to secure paid employment, though he might be able obtain volunteer employment. *Id.* at 1193. In *Athridge,* the court awarded the plaintiff $4,000,000 for the pain and suffering he had endured and would continue to endure, noting that the defendant must compensate the plaintiff for his severe mental and physical injuries. *Id.* at 1194.

Considering the pain and suffering that the plaintiff has already suffered and will continue to suffer throughout his life because of his injuries, and considering the $4,000,000 damage award in *Athridge* for a plaintiff with similar but slightly less severe injuries, the court awards the plaintiff $5,000,000 in pain and suffering damages. *Wood,* 859 F.2d at 1493; *Athridge,* 950 F.Supp. at 1192. Especially when compared to the plaintiff in *Athridge,* the plaintiff's injuries provide a reasonable basis for this award. *Id.*

### C. Past Medical Care Expenses

The plaintiff requests an award of $899,325 for the medical care expenses that he incurred because of the accident. Pl.'s 2d Am. Prop. FFCL at 73–75. The defendant does not contest this amount, but asks the court to subtract from this award the amounts that his health care providers forgave or "wrote-off." Def.'s Reasonable Value Br. at 2. The defendant explains that the amount that the plaintiff

actually paid—as opposed to the amount paid plus the written-off amounts—represents the reasonable value of the care. *Id.* The plaintiff objects to this request, arguing that pursuant to the collateral source rule, any written-off amounts are irrelevant and the award for past medical expenses should be $899,325, the amount billed. Pl.'s Reply at 9.

Plaintiffs are entitled to recover for past medical care expenses as well as the cost of reasonable diagnostic examinations. *Friends For All Children, Inc. v. Lockheed Aircraft Corp.,* 746 F.2d 816, 824–26 (D.C.Cir.1984). In the District of Columbia, compensatory damages are subject to the collateral source rule, which states that "payments to the injured party from a collateral source are not allowed to diminish damages recoverable from the tortfeasor." *Hardi v. Mezzanotte,* 818 A.2d 974, 984 (D.C.2003). This collateral source rule applies when either (1) the source of the benefit is independent of the tortfeasor or (2) the plaintiff contracted for the possibility of a double recovery. *Hardi,* 818 A.2d at 984.

The collateral source rule explicitly permits compensatory damages to include written-off amounts. *Hardi,* 818 A.2d at 984. In *Hardi,* the health care provider reduced the required payment pursuant to a contractual agreement with the injured plaintiff's insurance company. *Id.* Just as the defendant argues here, Dr. Hardi argued that the plaintiff should not be able to recover written-off amounts. *Id.* at 984–85. The court ruled that the collateral source rule applied and the injured plaintiff should receive the benefit of the agreement "including any reduction in payments that the insurance carrier was able to negotiate [for the plaintiff]." *Id.* The court relied in part on a case where the hospital did not charge for medical services, explaining that "the interests of society are

likely to be better served if the injured person is benefitted than if the wrongdoer is benefitted." *Id.* at 984 (citing *Hudson v. Lazarus*, 217 F.2d 344, 346 (D.C.Cir. 1954)).

The collateral source rule applies in this case because the source of the benefit, the plaintiff's medical care providers' alleged writing-off of costs, is independent of the tortfeasor. *Hardi*, 818 A.2d at 984. The collateral source rule permits the plaintiff to recover all of his medical costs, regardless of any written-off amounts. *Id.* Accordingly, the court awards the plaintiff $899,325 as damages for his past medical expenses. *Friends For All Children*, 746 F.2d at 824–26.

### D. Discounting to Present Value Awards for Future Damages

Before addressing the substance of the damages awards for future lost wages and medical and related expenses, the court discusses the methodology of calculating the present value of an award for future losses. For this purpose, the plaintiff advocates using the market interest rate method, while the defendant favors the real interest rate methodology and offers testimony of the use of an annuity as relevant to the present value calculation. Pl.'s 2d Am. Prop. FFCL at 78; Def.'s Prop. FFCL at 24, 29.

■ Courts must discount to present value lump-sum damages awards intended to compensate for future medical costs or future lost wages. *Jones & Laughlin Steel Corp. v. Pfeifer*, 462 U.S. 523, 533, 536–37, 103 S.Ct. 2541, 76 L.Ed.2d 768 (1983); *Hull v. United States*, 971 F.2d 1499, 1510 (10th Cir.1992); *see also Martinez v. United States*, 780 F.2d 525, 528 (5th Cir.1986) (explaining that for FTCA cases, state law determines how to account for inflation). The leading case regarding calculating the present value of future damages is *Pfeifer*, which involves calculating future lost

wages in an action brought pursuant to the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. §§ 904–05. *Pfeifer*, 462 U.S. at 523–53, 103 S.Ct. 2541. In discounting a lump-sum award for future damages to present value, the discounting methodology must take into account two factors. *Id.* at 537, 103 S.Ct. 2541. First, the methodology must take into account the time-value of money, that is, the fact that money awarded today can be invested to earn a return. *Id.* Second, the methodology must consider the effects of inflation. *Id.* at 540–41, 103 S.Ct. 2541. The discount rate should be based on the interest that can be earned with the safest available investments. *Pfeifer*, 462 U.S. at 537, 103 S.Ct. 2541.

■ Regardless of the method of calculation, the court must rely on competent evidence in determining the discount rate. *Colleen v. United States*, 843 F.2d 329, 331 (9th Cir.1988); *Hull I*, 971 F.2d at 1511. In calculating the discount rate, courts should not select a time period "over which to compare inflation and interest rates that provides a decidedly aberrational result." *Trevino v. United States*, 804 F.2d 1512, 1519 (9th Cir.1986); *see also Scott v. United States*, 884 F.2d 1280, 1286–87 (9th Cir.1989).

■ The first case in this jurisdiction that dealt with the effects of inflation in arriving at an award for loss of future income was *Barriteau*, 399 A.2d 563. Dr. Lurito, the plaintiff's economics expert in this case, was also the plaintiff's expert in *Barriteau*, a personal injury case. In that case, Dr. Lurito used the market interest rate method, applied an escalation factor based on the 20–year history of wages for nurses and nurses' assistants, and reduced future losses to present value by applying an after-tax discount rate. *Id.* at 568–69. *Barriteau* is the primary authority in this

jurisdiction for the proposition that "the loss of future earnings—or, more precisely, the loss of future earning capacity—is a distinct item of damages which, if properly proved at trial, may result in recovery for the plaintiff." *Nat'l R.R. Passenger Corp. v. McDavitt*, 804 A.2d 275, 290 (D.C.2002) (engineer's wages assumed to grow at an annual rate of three percent) (citing *Barriteau*, 399 A.2d at 567).

In an FTCA case, the Ninth Circuit held a military hospital liable for causing severe disability to a newborn child. *Trevino*, 804 F.2d at 1514. In evaluating the district court's award of damages for future lost wages and damages for future medical expenses, the Ninth Circuit explained that the rate of increase in wages may differ from the rate of increase in medical costs over the same period. *Id.* at 1519. "For this reason, the measure of inflation for the purpose of calculating the discount rate to be applied to the medical expense portion of [the plaintiff's] award may be different than that employed in fixing the discount rate applicable to the lost wage portion of her award." *Id.* Like in *Trevino*, to calculate the present value of the damages in a manner that accounts for medical costs that [may] rise faster than the rate of inflation, the court uses one net discount rate to calculate the present value of the future medical costs and a second net discount rate to calculate the present value of the future lost wages. *Id.; see also Pfeifer*, 462 U.S. at 537, 541–44, 548, 103 S.Ct. 2541; *Samaritan Inns, Inc. v. District of Columbia*, 114 F.3d 1227, 1238 n. 13 (D.C.Cir.1997) (citing *Pfeifer*, 462 U.S. at 536–42, 103 S.Ct. 2541).

█ As in *Barriteau*, Dr. Lurito utilized the market interest rate method in the instant case. Dr. Lurito calculated the likely escalation of future wages and future care costs and then discounted those future damages figures to present value us-ing an after-tax discount rate. *Barriteau*, 399 A.2d at 569. As discussed by the Supreme Court in *Pfeifer*, this "market interest rate" method entails (a) estimating future rates of inflation for various items of future damages; (b) calculating the effects of future inflation on such items; (c) determining an appropriate after-tax market interest rate; and (d) applying the after-tax market interest rate to determine the present value of the plaintiff's future damages. *Pfeifer*, 462 U.S. at 542–44, 548, 103 S.Ct. 2541. The market interest rate approach is different from the "total offset approach," which assumes that the rate of increase in wages and prices is always exactly offset by the after-tax market interest rate. *Id.* It is also different from the "real interest rate" approach, which excludes evidence of future price inflation and discounts by the observed or nominal market interest rate less inflation. *Id.* at 546–48, 103 S.Ct. 2541.

In this case, Dr. Lurito used a 4.5 percent after-tax discount rate to reduce to present value the plaintiff's future lost earnings and medical and related expenses. His choice of this rate is in line with the basic economic principles discussed in *Pfeifer*, 462 U.S. at 537, 103 S.Ct. 2541. In that case, the Court explained that the discount rate should be based on the rate of interest that the plaintiff would earn on "the best and safest investments." *Id. Pfeifer* also requires that the discount rate should represent the after-tax rate of return. *Id.* Use of an after-tax discount rate is based on the taxability of earnings on investments, and the effects of taxation are mitigated to the extent that medical expenses are deductible against income. Dr. Lurito explained that even if medical and related expenses are deducted, the first 7.5 percent of such expenses, and any

income over and above 92.5 percent of such expenses, would be taxable.

The appropriate net discount rate depends on the economic facts that the parties have proven. *Culver v. Slater Boat Co.,* 722 F.2d 114, 120–21 (5th Cir.1983) (stating that "while the studies find that the real rate varies, estimates uniformly fix its amount over any fairly lengthy period as falling into a range that runs from 3.0 percent to a negative rate of 1.5 percent"). Significantly, the leading case in the District of Columbia on this subject involved application of a net discount rate of negative 0.75 percent. *Barriteau,* 399 A.2d at 566; *cf. Hughes v. Pender,* 391 A.2d 259, 262 (D.C.1978) (applying a 1.0 percent discount rate). Thus, in light of District of Columbia law and the facts of this case, the court accepts Dr. Lurito's use of a 0.0 percent net discount rate for the loss of future wages award and a negative 0.5 percent net discount rate for the future medical and related expenses. The court has a reasonable basis for using these net discount rates: they are based on reliable expert testimony and they comport with the facts of this case. *Barriteau,* 399 A.2d at 566, *Trevino,* 804 F.2d at 1519.

Considering the defendant's annuity evidence, the court notes that evidence regarding the cost of an annuity is not a fair measure of the present value of the plaintiff's future damages. *Wood,* 859 F.2d at 1492–93. First, while the court must consider annuity evidence to the extent it relates to the present value calculation, there is no requirement that plaintiff accept an annuity, nor is there any evidence in this case that the plaintiff will in fact invest the proceeds of his judgment into an annuity. *Muenstermann,* 787 F.Supp. at 526–27 (absent agreement of parties, the court has no alternative but to order the payment of a lump sum). Second, annuity-

cost testimony is predicated on the invalid assumption that the plaintiff would "put all his eggs in one basket." *Id.* For these reasons, and based on the testimony of the economics experts, the court considers and rejects the defendant's annuity evidence. *Wood,* 859 F.2d at 1492–93.

### E. The Plaintiff's Award for Future Lost Wages

The court now turns to the plaintiff's claims for future lost wages. The plaintiff seeks an award of $2,562,906, and the defendant asserts that the award should be $546,663. Pl.'s 2d Am. Prop. FFCL at 93; Def.'s Prop. FFCL at 12.

 Considering the plaintiff's request for future lost wages, the court must evaluate whether he has proven the future consequences of the accident by a reasonable certainty. *Wood,* 859 F.2d at 1492. In order for the estimate of future lost wages to be reliable, the court must base it on facts specific to the plaintiff. *Wash. Metro. Area Trans. Auth. v. Davis,* 606 A.2d 165, 178 (D.C.1992). Because the plaintiff has not yet chosen a livelihood, the court must determine future lost earnings on the basis of potential rather than demonstrated earning capacity. *Hughes,* 391 A.2d at 263. The court must extrapolate that potential from the plaintiff's individual characteristics such as age, sex, socio-economic status, family characteristics, criminal behavior, academic record, intelligence and dexterity. *Id.* Further, "the plaintiff's occupational abilities, industriousness, work habits and experience are relevant" in estimating the future earnings he would accrue over the course of his lifetime. *McDavitt,* 804 A.2d at 290.

Accordingly, the court considers that before the accident the plaintiff had several problems, including (1) the past abuse of alcohol, marijuana, cocaine, inhalants, and intravenous drugs, (2) the present abuse of marijuana and (3) a diagnosis of depres-

sion. The plaintiff's prospects improved, however, in January 1997 when he returned to the United States to live with his mother, largely due to her close supervision of him. At the time of the accident, the plaintiff was in school, was excelling in his position at Kentucky Fried Chicken, was a devoted and reliable member of a soccer team, and was planning to attend NOVA. *McDavitt,* 804 A.2d at 290. The plaintiff's brother's path had provided him with a road map to graduate school. Indeed, his entire family is very well-educated: his mother has a doctorate degree, his father is a pediatrician, his brother is in medical school, and an uncle and a cousin are veterinarians. *Athridge,* 950 F.Supp. at 1193 (finding it reasonably likely that an injured adolescent would have earned a professional degree given his family's academic history and his own academic record). Significantly, the plaintiff was a bright young man with good cognitive functions, fluency in English and Spanish, and a decent academic record. *Id.* The court also found credible the testimony of the plaintiff's vocational rehabilitation expert, Dr. Davis, that but for the accident the plaintiff would have completed college and two years of graduate study. *Hughes,* 391 A.2d at 263. In sum, the evidence demonstrates to a reasonable certainty that but for the accident the plaintiff would have completed college and two years of graduate study. *Athridge,* 950 F.Supp. at 1193; *Wood,* 859 F.2d at 1492–93; *Hughes,* 391 A.2d at 263; *McDavitt,* 804 A.2d at 290.

After determining the amount of future earnings that the plaintiff would have earned but for the tort, the court must discount the amount to its present value. *Barriteau,* 399 A.2d at 568. Dr. Lurito, the plaintiff's expert economist, relied on Dr. Davis' conclusion that, absent the 1998 injury, the plaintiff would probably have graduated from college and completed two

years of graduate study. *Groobert v. Pres. & Directors of Georgetown College,* 219 F.Supp.2d 1, 6 (D.D.C.2002) (demonstrating that an expert economist is permitted to rely on other expert opinions). Dr. Lurito testified that the plaintiff's estimated after-tax future lost wages, reduced to present value with a zero percent net discount rate (obtained by subtracting a 4.5 percent growth rate from a 4.5 percent after-tax discount rate), amount to $2,562,906. *Pfeifer,* 462 U.S. at 537, 103 S.Ct. 2541 (explaining that "the lost stream of income should be estimated in after-tax terms, the discount rate should also represent the after-tax rate of return to the injured worker"). Because the court concludes that Dr. Lurito's calculations are reasonable and based on substantial evidence, the court awards the plaintiff $2,562,906 for future lost wages. *Wood,* 859 F.2d at 1492–93.

### F. The Plaintiff's Award for Future Medical and Related Expenses

Considering the issue of future medical and related expenses, the court notes that the plaintiff asks for $15,435,836 for these future costs. Pl.'s 2d Am. Prop. FFCL at 93. The defendant argues that this award should be $3,805,000. Def.'s Prop. FFCL at 20. In estimating the cost of the plaintiff's future medical and related expenses, the court recognizes the significant discrepancy between the parties' estimates.

The plaintiff is entitled to an award for future medical and related expenses that are reasonable and necessary. *Muenstermann,* 787 F.Supp. at 522; *see also Friends For All Children,* 746 F.2d at 824–26. Yearly evaluations and diagnostic examinations are proper items of damages when recommended to ensure that the plaintiff's treatment is proceeding properly and that any physical, emotional or developmental difficulties are diagnosed early.

*Muenstermann,* 787 F.Supp. at 523; *see also Friends For All Children,* 746 F.2d at 824–26. Equipment purchases are also a proper item of damages where the evidence shows that the plaintiff's development will improve with the assistance of such equipment. *Muenstermann,* 787 F.Supp. at 523. When the plaintiff's future need for full-time attendant care is more likely than not, an award including such care is proper. *Muenstermann,* 787 F.Supp. at 523; *Ramrattan v. Burger King Corp.,* 656 F.Supp. 522, 524–25 (D.Md.1987). The argument that the plaintiff does not need attendant care because a family member is providing it is unpersuasive. *Lester v. Dunn,* 475 F.2d 983, 985–86 (D.C.Cir.1973). In addition, a plaintiff has no duty to mitigate her damages award by accepting a less costly form of medical care. *Muenstermann,* 787 F.Supp. at 523; *Ramrattan,* 656 F.Supp. at 525. Rather, the plaintiff "may select from among a number of reasonable alternatives." *Id.*

After listening to and reviewing the extensive testimony regarding the plaintiff's life care plan, the court concludes that the plaintiff's experts recommend all of the items in the plaintiff's life care plan as reasonable and necessary for the future treatment of his injuries as caused by the accident. *Muenstermann,* 787 F.Supp. at 523. Furthermore, while the provisions for the plaintiff's attendant care is highly contested and costly—especially because the plaintiff's plan does not include group care—the court concludes that the plaintiff has no duty to accept a less costly form of care. *Id.* Thus, the award of damages to pay for eight hours per day of skilled attendant care and 16 hours per day of non-skilled attendant care is proper. *Id.* The court concludes that the plaintiff has proven to a reasonable certainty that the items listed in his proposed life care plan are reasonable and medically necessary.

*Muenstermann,* 787 F.Supp. at 523; *Ramrattan,* 656 F.Supp. at 525.

■ Dr. Lurito, the plaintiff's expert economist, relied on Nurse Barker's life care plan to calculate the plaintiff's future medical and related expenses as necessitated by the accident. As stated previously, an expert economist may rely on the opinions of other experts. *Groobert,* 219 F.Supp.2d at 6. Dr. Lurito testified that the plaintiff's estimated future medical and related expenses, reduced to present value with a negative 0.5 percent net discount rate (obtained by subtracting a 5.0 percent growth rate from a 4.5 percent after-tax discount rate), amount to $15,435,836. *Pfeifer,* 462 U.S. at 537, 103 S.Ct. 2541. Because the court concludes that Dr. Lurito's calculations are reasonable and based on substantial evidence, the court awards the plaintiff $15,435,836 for future medical and related expenses. *Id.; Wood,* 859 F.2d at 1492–93.

### G. Reversionary Medical Trust

■ The defendant argues that the court should permit the defendant to provide the plaintiff's damages award for future medical costs in a reversionary trust. Def.'s Prop. FFCL at 20–23. The plaintiff and the court-appointed guardian *ad litem* object to this proposal. Pl.'s Reversionary Trust Br. at 4; GAL Reversionary Trust Br. at 2.

In determining whether a reversionary trust is appropriate, the court gives significant weight to whether the plaintiff or his guardian *ad litem* consent to the use of a reversionary trust. *Hull I,* 971 F.2d at 1504. The burden is on the requesting party to show that a reversionary trust is in the best interest of the injured party. *Hill v. United States,* 81 F.3d 118, 121 (10th Cir.1996). Courts have routinely rejected requests for reversionary trusts

where the injured party, through his guardian ad litem, objects to the trust and the defendant offers no evidence of the benefit to the injured party. *Id.; Wyatt v. United States,* 944 F.Supp. 803, 804 (E.D.Mo.1996) (rejecting motion for reversionary trust when the competent adult plaintiff objected and the defendant offered no reason why a trust would benefit him). Because the plaintiff and his guardian *ad litem* both oppose the imposition of a reversionary trust, the defendant has presented no evidence in support of its request and the defendant has not demonstrated that a trust is in the best interest of the plaintiff, the court denies the request for a reversionary trust. *Hill,* 81 F.3d at 121; *Hull I,* 971 F.2d at 1504–05.

### H. Guardian *ad Litem* Costs

The plaintiff asks the court to tax the guardian *ad litem* fees against the United States as costs. Pl.'s 2d Am. Prop. FFCL at 91. The defendant objects to this request. Def.'s GAL Fees Br. at 1. The plaintiff, however, has not submitted any evidence detailing the relevant guardian *ad litem* costs.

In FTCA actions, courts have interpreted Federal Rule of Civil Procedure 54(d) to allow taxation of guardian *ad litem* expenses as costs against the United States. *Hull I,* 971 F.2d at 1510 ("*Hull I*"); *Lebron v. United States,* 279 F.3d 321, 332 (5th Cir.2002). Rule 54(d) states, "costs other than attorneys' fees shall be allowed . . . to the prevailing party unless the court otherwise directs; but costs against the United States . . . shall be imposed only to the extent permitted by law." Fed.R.Civ.P. 54(d). Where the same person performs services as a guardian *ad litem* and as an attorney, only fees for services rendered in the role of guardian *ad litem* are taxable as costs. *Hull I,* 971 F.2d at 1510. The Tenth Circuit defined this guardian *ad litem* role as acting as an officer of the court and looking after the interests of the plaintiff. *Id.* (remanding to "determine what portion of the guardian *ad litem's* fees was properly taxed as costs and what portion should have been deducted from the damages award as attorney's fees"). Even if the guardian *ad litem* performed legal tasks for the plaintiff, such as legal research, the court can tax these expenses as costs so long as the guardian *ad litem* did not perform the legal tasks in the role of the plaintiff's attorney. *Hull v. United States,* 53 F.3d 1125, 1128 (10th Cir.1995) ("*Hull II*").

To the extent the guardian *ad litem* was performing his guardian role—acting as an officer of the court and looking after the interests of the plaintiff—the defendant should pay his costs. Thus, the court grants the plaintiff's request for taxation of the guardian *ad litem* expenses as costs against the defendant. *Hull I,* 971 F.2d at 1510; *Hull II,* 53 F.3d at 1128. Because the plaintiff has not submitted detailed and sworn records from the guardian *ad litem,* however, the court cannot determine what amount of his fees are for services rendered in the guardian *ad litem* role, and what amount are for services rendered as an attorney. Therefore, the court orders the plaintiff to submit an affidavit from the guardian *ad litem* detailing any services rendered in the guardian *ad litem* role, and any services rendered in an attorney role, and itemizing all fees and costs. *Id.*

### I. FTCA Cap on the Damages Award

On September 8, 1998, pursuant to the FTCA, the plaintiff's counsel filed with the defendant an administrative tort claim seeking $20,000,000 for "personal injury." Compl. Ex. C (Form 95 dated Sept. 8, 1998). The plaintiff now asks the court for a damages award of $26,898,067. Pl.'s Prop. FFCL at 93. The defendant argues that the FTCA limits the plaintiff's recov-

ery to the amount in the administrative claim, $20,000,000. Def.'s Resp. at 16. The plaintiff has presented no evidence on this issue and has not addressed this issue.

■ Considering the relevant law, the court notes that the FTCA explicitly states that a plaintiff's damages under the FTCA are limited to the amount requested in the administrative claim unless the plaintiff can satisfy a stringent "newly discovered evidence" or "intervening facts" standard. 28 U.S.C. § 2675(b); *Pullen v. United States*, 1997 WL 350003, at *2, 1997 U.S. Dist. LEXIS 8910, at *18–*20 (D.D.C. June 11, 1997). If a plaintiff could have reasonably obtained the information on the specific injuries needed to make out the worst-case scenario when he filed the original claim, then new information about the injuries will not qualify as "newly discovered evidence" or "intervening facts." *Dickerson v. United States*, 280 F.3d 470, 476 (5th Cir.2002). Newly discovered evidence is evidence that materially differs from the worst-case prognosis of which the claimant knew or could reasonably have known when he filed the claim, not evidence that merely bears on the precision of the prognosis. *Zurba v. United States*, 318 F.3d 736, 741 (7th Cir.2002); *Low v. United States*, 795 F.2d 466, 471 (5th Cir.1986).

In this action, the plaintiff has not argued that any evidence could qualify as "newly discovered evidence" or "intervening facts." Indeed, as the defendant points out, the plaintiff's condition has improved since he filed his administrative claim. Def.'s Resp. at 16. Having reviewed the evidence of the plaintiff's condition, the court concludes that no "newly discovered evidence" or "intervening facts" exist that could justify an increased amount for the plaintiff's personal injury claim. *Dickerson*, 280 F.3d at 476. Accordingly, the court limits the plaintiff's damages award to $20,000,000.

## IV. CONCLUSION

For all these reasons, the court grants the plaintiff the following compensatory damages: $5,000,000 for pain and suffering, $899,325 for past medical expenses, $2,562,906 for future lost wages and $15,435,836 for his future medical and related expenses. The court reduces the total award to $20,000,000 to account for the fact that the plaintiff's administrative claim for damages requests that amount. The court also declines to adopt the defendant's request for a reversionary medical trust and determines that the defendant shall pay any fees of the guardian *ad litem* for services rendered in the guardian *ad litem* role. An order directing the parties in a manner consistent with this Memorandum Opinion is separately and contemporaneously issued this —— day of September, 2003.